David NIENHAUS, Plaintiff,

v.

Larry G. MASSANARI,[1] Acting
Commissioner of Social
Security, Defendant.

No. 99–4104–DES.

United States District Court,
D. Kansas.

Aug. 6, 2001.

---

1. Effective March 29, 2001, Larry G. Massanari became the Acting Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Larry G. Massanari is substituted for Kenneth S. Apfel as the defendant in this action.

Steven M. Tilton, Tilton & Tilton, LLP, Topeka, KS, for Plaintiff.

Jackie A. Rapstine, Office of the U.S. Atty., Topeka, KS, for Defendant.

### *MEMORANDUM AND ORDER*

SAFFELS, District Judge.

This matter is before the court on plaintiff's Complaint (Doc. 1), filed June 29, 1999, appealing the Social Security Commissioner's denial of his applications for disability benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* and for supplemental security income ("SSI") benefits under Title XVI of the act, 42 U.S.C. § 1381 *et seq.*

## I. PROCEDURAL BACKGROUND

Plaintiff filed an application for disability benefits on February 25, 1997 and for SSI benefits on February 12, 1997. Plaintiff alleges his disability began on June 30, 1995. Plaintiff's applications received due consideration but were denied on May 12, 1997. Plaintiff applied for reconsideration on June 6, 1997, and plaintiff was once again denied on June 23, 1997. An administrative hearing was held before Administrative Law Judge, Gary E. Lowe ("ALJ") on May 20, 1998. The ALJ rendered a written decision unfavorable to plaintiff on July 30, 1998. The Appeals Council denied plaintiff's request for review on May 27, 1998. Plaintiff timely filed his complaint with the court seeking an order reversing the ALJ's decision.

## II. STANDARD OF REVIEW

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that "the finding of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive ...." Substantial evidence is more than a scintilla and is that evidence that a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales,* 402 U.S. 389, 401–02, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The court will also determine whether the Commissioner applied the correct legal standards. *See Washington v. Shalala,* 37 F.3d 1437, 1439 (10th Cir. 1994).

During its review, however, the court will not reweigh the evidence or substitute its judgment for the Commissioner's. *See Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994). On the other hand, the court will not merely accept the Commissioner's findings. *See Claassen v. Heckler,* 600 F.Supp. 1507, 1509 (D.Kan.1985). Any new evidence not considered by the ALJ but submitted to the Appeals Council and considered in denying a request for review becomes part of the administrative record and will be considered by the court. *O'Dell v. Shalala,* 44 F.3d 855, 859 (10th Cir.1994).

In order to determine whether a Social Security claimant is disabled, the Commissioner has developed a five-step sequential evaluation. *See* 20 C.F.R. § 404.1520. *See also Williams v. Bowen,* 844 F.2d 748, 750–52 (10th Cir.1988). If the claimant fails at any of the steps where he or she bears the burden of proof, consideration of any subsequent steps is rendered unnecessary. *See id.* at 750 ("If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."). The claimant bears the burden of proof at steps one through four.

The initial inquiry is whether the claimant is engaged in substantial gainful activity. If not, the second step requires the fact finder to determine whether the claimant has a medically severe impairment or combination of impairments. *See Bowen v. Yuckert,* 482 U.S. 137, 140–41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). If the claimant does not have a severe impairment, step three entails determining "whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity." *Id.* at 141, 107 S.Ct. 2287. If there is no such equivalency, the claimant must show at step four that the "impairment prevents the claimant from performing work he has performed in the past." *Id.* At the fifth step, the fact finder must determine whether the claimant has the residual functional capacity ("RFC") "to perform other work in the national economy in view of his age, education, and work experience." *Id.* at 142, 107 S.Ct. 2287. The Commissioner bears the burden of proof at

step five. *See id.* at 146 n. 5, 107 S.Ct. 2287.

## III. FACTUAL BACKGROUND

### A. Relevant Medical History

Plaintiff's alleged disability stems primarily from pain associated with his lower back. Plaintiff's relevant medical history begins back in 1985. On January 7, 1985, plaintiff was admitted to Geary Community Hospital, Junction City, Kansas, complaining of low back and right leg pain. A subsequent CT scan revealed a L5–S1 herniated disk midline on the right side. Plaintiff underwent relatively conservative treatment, which included epidural steroid injections and chemonucleolysis. Several months later plaintiff had a resurgence of pain and was readmitted to the hospital. A myelogram revealed a large central herniated disc, and the decision was made to perform surgery on plaintiff's back. A lumbar laminectomy with excision of the L4–5 disk on the right was performed on May 13, 1985, at Geary Community Hospital.

After plaintiff's surgery, the medical history is relatively silent until June 3, 1989. On this day, plaintiff presented to Tim M. Penner, M.D. at the Clay County Hospital, Clay Center, Kansas. Plaintiff suffered a resurgence of back pain while performing a physical task at work. Dr. Penner opined plaintiff suffered a probable lumbosacral strain and noted plaintiff's history of lumbar disk disease. Dr. Penner prescribed Motrin and discussed possible epidural injections.

Plaintiff was seen again on October 28, 1991, by Dr. Penner in response to another incident at work. A subsequent CT scan revealed some acquired spinal stenosis at L4–5 from a recurrent herniated disk fragment versus post-surgical scarring and some degenerative changes causing some spinal canal narrowing at L5–S1.

On December 10, 1991, plaintiff was examined by William T. Jones, M.D. at the Clay Center Orthopaedic Clinic. X-rays revealed some degenerative changes at L4–5 and 5–1 with some anterior spurs over L4–5 and some disk narrowing at 5–1. A CT scan was suggestive of extradural defect at L4–5 and some narrowing. Dr. Jones administered two epidural steroid injections on plaintiff in late 1991 and early 1992, and Dr. Jones recommended physical therapy. Plaintiff had subsequent visits with Dr. Jones in 1992, all revealing pain related to a possible herniated nucleas pulposus and degenerative disk disease.

Plaintiff continued to see Dr. Penner in 1994 and 1995 with similar findings and recommendations. On July 25, 1995, plaintiff presented at The Saint Mary Hospital in Manhattan, Kansas. A MRI revealed disk bulging at L2–3 as well as spinal stenosis at L3–4. A disk herniation was also present at L4–5 with right laminectomy and post-operative fibrosis. On November 14, 1995, plaintiff was again seen by Dr. Jones. Dr. Jones opined that plaintiff had a permanent partial physical impairment rating of five percent of the whole person and recommended plaintiff not return to work driving a tractor trailer. Dr. Jones also gave plaintiff physical functional restrictions.

By the request of the State of West Virginia, Disability Determination Section, plaintiff was examined by Miraflor G. Khorshad, M.D. on March 27, 1997. An x-ray showed narrowing of the disk space at L4–5 and L5–S1 and osteophyte formation. Dr. Khorshad opined plaintiff had chronic back pain secondary to degenerative changes.

Plaintiff was seen by Scott Ketcher, M.D. on November 17, 1997. Again, plaintiff presented with low back and extremity pain. Plaintiff presented to Dr. Ketcher several times throughout 1997 and 1998.

In early January 1998, plaintiff received more epidural steroid injections through Dr. Penner's office.

## B. Plaintiff's Testimony

At his administrative hearing, plaintiff testified in detail to his physical limitations related to his alleged disability. At the time of his hearing, plaintiff was forty-six years old. He testified to having a high school education with completion of a GED.

Plaintiff testified that he suffers from considerable back pain. He alleged he can sit in a straight-backed chair for up to but not more than thirty to thirty-five minutes. He stated he could stand in one basic spot for about ten to fifteen minutes before his legs begin to get weak and hurt, and plaintiff indicated he could walk no more than one block. He testified he occasionally uses a walker around the house to steady his balance. Plaintiff believed he could only lift approximately ten to fifteen pounds. He takes the pharmaceutical, Ultram, for relief of his pain. The medication, however, makes plaintiff drowsy and, at times, requires him to lay down and rest.

Plaintiff testified to generally going to bed at midnight and waking up anywhere from three to five in the morning, receiving only three to five hours of sleep per night. He stated he spends approximately four to five hours a day in his recliner. He is able to do some housework including: preparing the children for school, doing some dishes, laundry, and sweeping. He testified that he can do the activities for ten to fifteen minutes then is forced to rest in his recliner before completing the tasks. He is unable to do the grocery shopping because of his inability to walk. He participates in limited physical hobbies and leisure activities. Plaintiff smokes two to three packs of cigarettes per day and has smoked for twenty to twenty-five years. He denied consuming any alcohol.

## C. Plaintiff's Work History

From 1981 to 1988, plaintiff held a variety of unskilled and semi-skilled jobs including: rental clerk at a rental center; concrete laborer; maintenance worker; plumbing laborer; construction laborer; and retail sales cashier. Starting in 1988, plaintiff was continuously employed as a commercial truck driver. Plaintiff maintained employment as a truck driver until June of 1995. Since that date, plaintiff has not been employed.

## IV. ALJ'S DECISION

In his decision, the ALJ made the following findings:

1. Claimant met the disability insured status requirements of the Act on June 30, 1995, the date claimant stated he became unable to work, and has acquired sufficient quarters of coverage to remain insured through at least December 31, 2000.

2. Claimant has not engaged in substantial gainful activity since July 1995.

3. The medical evidence establishes that claimant has low back pain, an impairment which is severe but which does not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

4. Claimant's statements concerning his impairment and its impact on his ability to work are not entirely credible.

5. Claimant has the RFC to stand a total of 2 hours and sit a total of 6 hours in an 8 hour day but must alternate positions every 30 to 40

minutes. He can lift 5 to 10 pounds, but any pushing, pulling, bending, twisting, or reaching above his head are contraindicated.

6. Claimant is unable to perform his past relevant work as a truck driver, maintenance man, or plumber's helper.

7. Claimant has ranged between and [sic] 43 and 46 years old during the time pertinent to this appeal, which is considered a "younger" individual.

8. Claimant has a "high school" education.

9. Claimant has semi-skilled work experience but has acquired no transferable work skills.

10. Based on an exertional capacity for sedentary work, and claimant's age, educational background, and work experience, [the Social Security regulations] would direct a conclusion of "not disabled."

11. Considering claimant's age, education, past work experience, and the above found RFC within the framework of [the Social Security regulations] claimant has the work capacity compatible with making a work adjustment to substantial numbers of unskilled jobs.

12. Claimant has not been under a "disability," as defined in the Social Security Act, as amended, at any time through the date of this decision.

(R. at 33) (internal citations omitted).

Plaintiff primarily asserts the ALJ improperly found he had a sufficient RFC to perform other work in the national economy under step five of the sequential analysis. Plaintiff also presents several individualized instances of error on the part of the ALJ, so the court will address each in turn.

## V. DISCUSSION

### A. Step Three–Listed Impairment

Plaintiff asserts the ALJ erred in reaching his conclusion that plaintiff's impairment did not meet or equal a listed impairment. Specifically, plaintiff argues his condition meets the requirements for a spinal disorder as set out in the social security regulations. The relevant regulation describes the listed impairment as follows:

Other vertebrogenic disorders (e.g., herniated nucleus puplosus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:

1. Pain, muscle spasm, and significant limitation of motion in the spine; and

2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.05(C).

Plaintiff specifically argues the ALJ did not properly consider all relevant evidence as directed by *Clifton v. Chater*, 79 F.3d 1007 (10th Cir.1996). In *Clifton*, the Tenth Circuit held that the ALJ must identify and discuss the relevant evidence he relied upon or rejected in ruling a claimant's impairment failed to meet or equal a listed impairment. 79 F.3d at 1009–10. Defendant asserts the ALJ satisfactorily discussed the rationale for his decision and substantial evidence supports the ALJ's conclusion.

After review of the ALJ's decision, the court is convinced the ALJ properly considered the majority of the medical evidence in relation to the issues presented at the third step of the analysis. There are three essential elements to meeting the listing quoted above: (1) claimant must

show a persistent vertebrogenic disorder; (2) the disorder must involve pain, muscle spasm, and significant limitation of motion in the spine; and (3) the disorder must involve appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss. The ALJ found plaintiff's condition did not meet the listing because "clinical examination has consistently failed to find significant and persistent motor loss with muscle weakness and sensory and reflex loss." (R. 28). Plaintiff argues the ALJ improperly ignored evidence highlighting the third element.

First, as to motor loss, plaintiff points out multiple instances where his doctors indicated he had either a "stooped gait" or "hand tremors." The court finds the ALJ properly considered the majority of this particular evidence within his general discussion of the medical evidence. Additionally, substantial evidence supports the ALJ's determination. For example, in 1991, Dr. Jones indicated plaintiff only had a "slight antalgic gait." (R. 228). In 1996, Dr. Patricoski noted plaintiff had a "slight hand tremor." (R. 235). The medical evidence does not reveal a significant degree of motor loss.

As for muscle strength, plaintiff again points to treatment notes within the record supposedly detailing indications of his muscle weakness. Again, however, the court concludes the ALJ did properly consider this evidence within his general discussion. Also, substantial evidence supports the ALJ determination. For example, in 1997, Dr. Ketcher noted "strength is *possibly* a little decreased on the right side" and "little decreased strength in the right side." (R. 274–75) (Emphasis added). In 1991, Dr. Penner stated plaintiff "may have a little bit of weakness." (R. 243). Finally, in 1992, Dr. Jones noted plaintiff "has weakness of the left toe extensors." (R. 226). The only evidence close in time to plaintiff's hearing amounted to a single doctor's note stating plaintiff had a slight decline in muscle strength.

Third, as to sensory and reflex loss, the court makes the same finding as above. Plaintiff's proffered evidence was considered by the ALJ and his determination is supported by the record. In particular, Dr. Penner found "no sensory deficits by exam." (R. 241). Also, Dr. Khorshad discovered "[n]o sensory deficit." (R. 248).

As a final matter, plaintiff alleges, contrary to the ALJ's ruling, that Dr. Ketcher stated plaintiff's impairment satisfied the listing. However, after reviewing the disputed record (R. 273), which is partially illegible, the court concludes Dr. Ketcher merely references the listing. There is no indication that Dr. Ketcher was making a definitive finding. In sum, the court finds the ALJ's decision did not run afoul of *Clifton* and substantial evidence supports the ALJ's determination that plaintiff's impairment did not meet or equal a listed impairment.

### B. Step Four and Five—Residual Functional Capacity

At step four of the analysis, the ALJ determined plaintiff retained the following RFC: "He can stand a total of 2 hours and sit a total of 6 hours in an 8 hour day but must alternate positions every 30 to 45 minutes; and can lift 5 to 10 pounds, but any pushing, pulling, bending, twisting, or reaching above his head is contraindicated." (R. 30). By utilizing this RFC under step four of the analysis, the ALJ determined plaintiff was prevented from doing his past relevant work. However, under step five, the ALJ found plaintiff was not disabled because his RFC was sufficient for significant employment. Plaintiff asserts this finding under step five is not supported by the record.

## 1. Treating Physicians

■ Plaintiff first argues the ALJ improperly discredited the evidence supplied by plaintiff's treating physicians. It is well established that a claimant's treating physician's opinion must be given substantial weight unless good cause is shown to disregard it. *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 289–90 (10th Cir.1995); *Williams v. Chater*, 923 F.Supp. 1373, 1379 (D.Kan.1996) (Noting a treating physician's opinion is entitle to greater weight because it "reflects expert judgment based on continuing observation of a patient's condition over a prolonged period of time.").

Plaintiff's primary treating physicians were Drs. Ketcher, Penner, and Jones. Both Drs. Ketcher and Penner completed a Medical Assessment of Ability to do Work–Related Physical Activities form. Dr. Ketcher found plaintiff to have extreme limitations, including the ability to sit, walk, or stand for only fifteen minutes continuously for a total of one hour in an eight hour day. (R. 271). Additionally, plaintiff must lie down for thirty minutes twice during an eight hour day. (R. 271). Dr. Ketcher also found plaintiff can rarely lift one to five pounds and should never lift over ten pounds. (R. 272). Finally, plaintiff was unable to perform simple grasping or fine manipulation with either of his hands. (R. 272). Dr. Penner's conclusions were remarkably similar to Dr. Ketcher's. Dr. Penner also found plaintiff to be severely limited in all aspects of physical activity. (R. 280).

■ Given the disparity between the doctors' assessments and the ALJ's RFC, it is obvious the ALJ completely disregarded their opinions. In fact, the ALJ made clear in his ruling that the opinions of Drs. Ketcher and Penner were given little to no weight. (R. 27). The ALJ's rationale for ignoring the opinions is premised primarily on a perceived absence of objective medical evidence supporting such severe physical limitations. The ALJ may reject the treating physician's opinion if the physician's records do not support the physician's conclusions, *James v. United States Dep't of Health & Human Servs.*, 47 F.3d 1178, 1995 WL 65454 (10th Cir. 1995) (table), or if the opinion is inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2).

■ Upon review, the court finds substantial evidence supports the ALJ's decision to disregard the doctors' opinions. First, as to Dr. Ketcher, his restrictions limit plaintiff to either sitting, standing, walking, or lying down for a total of four hours in an eight hour day. (R. 271). As the ALJ points out, Dr. Ketcher gives no indication of what position plaintiff could tolerate for the other four hours in an eight hour day. This inconsistency casts doubt on Dr. Ketcher's credibility. Additionally, Dr. Ketcher's notes reveal his discussion of plaintiff's allegedly disabling limitations consists of a single finding in 1997 that plaintiff has a "little decreased strength in the right side." (R. 275). This singular observation does not support the doctor's opinion. In fact, within the same treatment note, Dr. Ketcher states: "Not really in a lot of pain in the low back with palpatation." (R. 275). Dr. Ketcher's observation that plaintiff must lie down during the day is based on the fact that the pain medication plaintiff is taking causes drowsiness. (R. 271). However, Dr. Jones had, in the past, suggested plaintiff phase out the medication and replace it with a non-drowsy pain reliever. (R. 221).

As for Dr. Penner, the record is more complete in regards to his observation and treatment of plaintiff, yet again, the objective medical evidence does not support his opinion. First, as the ALJ notes, Dr. Penner's last examination of plaintiff was in July 27, 1995. (R. 241). Plaintiff asserts

Dr. Penner examined plaintiff in 1998. However, a review of the records reveals no indication Dr. Penner actually examined or visited with plaintiff during 1998. (R. 268–70). Instead, the records show plaintiff was seen by Brent Snyder, CRNA for epidural injections. Second, the notes from the July 1995 visits (R. 241) simply do not convey symptoms of an impairment remotely close to the restrictions opined by Dr. Penner in the physical assessment form. For example, Dr. Penner states: "Motor strength is normal, he has no sensory deficits by exam. He can toe stand OK. He has positive straight leg raising test on the right sitting and supine; questionably positive straight leg raising test on the left supine only." (R. 241). Finally, Dr. Penner's notes are replete with his hesitation as to treatment until hearing from Dr. Jones. However, Dr. Jones did not share Dr. Penner's opinion as to plaintiff's physical abilities.

On November 14, 1995, Dr. Jones gave the following opinion:

I do not feel that this patient should return to semitruck driving. He should also avoid the operation of heavy equipment. He should avoid activities which require bending, lifting, and twisting, particularly of weights more than 25 pounds from floor to waist or shoulder to above head. I feel that he should enter into a vocational rehabilitation program in an effort to find another line of work.

(R. 221). The limitations found by Dr. Jones are radically different than the limitations opined by Drs. Ketcher and Penner. Coincidentally, this is the same recommendation Dr. Jones gave when he saw plaintiff in 1992:

I do not think it would be in his best interest to return to his current job as a truck driver because of the vibratory stress as well as the heavy lifting, bending and twisting associated with the job.

I think it would be more prudent for this individual to enter vocational rehabilitation and try to find more sedentary work.

(R. 225). As defendant asserts, it is the ALJ's function to resolve conflicts among the various treating physicians, and the ALJ in this case sided in favor of Dr. Jones.

The ALJ's decision is further supported by the findings of the non-treating physicians. For example, on September 18, 1996, Dr. Patricoski stated "I filled out his DHS form saying no he is not able to work at the full customary work but yes he is able to perform other full time sedentary work." (R. 235). On April 23, 1997, Dr. Khorshad noted: "This patient has a chronic back pain which is secondary to some degenerative changes. He is willing to be referred for vocational rehabilitation. I think with his age and his work experience, he is a good candidate for vocational rehabilitation." (R. 249). During his examination of plaintiff, Dr. Khorshad found: "No noted muscle atrophy. No sensory deficit. Muscle strength is 5/5. He has normal gait. No assistive device is used. Patient is able to sit, squat and do the heel to toe maneuver. Gross and dexterous formation of hands are normal." (R. 249). Plaintiff argues emphatically that the assessments of Drs. Ketcher and Penner must control, noting their similarity as evidence of their credibility. However, these two documents stand in sharp contrast to almost every other piece of medical evidence in the record, including the doctors' own contemporaneous treatment notes. In sum, the court concludes the ALJ did not commit error in rejecting the assessments of Drs. Ketcher and Penner, for the doctors' own records do not support their findings and substantial evidence in the record contradicts the doctors' opinions.

## 2. Subjective Allegations of Pain

Plaintiff next asserts the ALJ improperly discredited plaintiff's subjective allegations of pain in determining his RFC. *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir.1987), provides the analytical framework for analyzing allegations of disabling pain.

> If a pain-producing impairment is demonstrated by objective medical evidence, the decision maker must consider the relationship between the impairment and the pain alleged. The impairment or abnormality must be one which could reasonably be expected to produce the alleged pain.... If an appropriate nexus does exist, the decision maker must then consider all the evidence presented to determine whether the claimant's pain is in fact disabling.

*Id.* (internal quotation marks and citations omitted). The initial phase of the inquiry, the objective impairment requirement, is met without regard to subjective evidence. *Williams v. Bowen*, 844 F.2d 748, 753 (10th Cir.1988). At the second phase, the relationship between the impairment and the pain alleged, only a loose nexus between the impairment and the claimed pain is required. *Luna*, 834 F.2d at 163. If an impairment is expected to produce some pain, allegations of disabling pain emanating from the impairment "are sufficiently consistent to satisfy this part of the evaluation process." *Id.* at 164. In the final phase, the decision maker will determine, by considering all relevant evidence, whether the claimant's pain is disabling. During this examination, the decision maker may judge the credibility of the claimant's assertions. *Id.*

The ALJ's decision is imprecise in specifically detailing each phase of the analysis. His conclusions regarding the first and second stage are intermixed with his discussion of plaintiff's credibility. The court will, therefore, consider each stage of the analysis in an attempt to ascertain whether the ALJ's final conclusion is supported by substantial evidence.

In the present case, there is ample evidence in the record to find plaintiff suffers from a herniated disk. This evidence is sufficient to satisfy the initial phase of inquiry.

█ In considering whether a nexus exists between plaintiff's herniated disk and the alleged disabling pain, plaintiff's subjective allegations of pain are taken as true. *Luna*, 834 F.2d at 163. The record contains multiple assertions by plaintiff that his pain is remarkable and greatly reduces his productivity and quality of life. At his hearing, plaintiff testified he quit his truck driving job because of the pain in his back. Additionally, plaintiff testified that he is forced to spend a significant portion of the day in his recliner. Multiple medical records indicate plaintiff's chief complaint to his physicians was lower back pain. Finally, plaintiff did testify that he was taking pain medication and receiving injections to control his pain. Because plaintiff need only show a "loose" nexus between his medically diagnosed condition and his alleged pain, the court finds that the above evidence satisfies the second phase of the *Luna* framework.

In the final phase of analysis, the ALJ, considering the objective and subjective evidence, concluded that plaintiff's allegations of disabling pain were not completely credible. In reviewing the ALJ's decision, the court is reminded that "special deference is traditionally afforded a trier of fact who makes a credibility finding." *Williams*, 844 F.2d at 755 (citing *Beavers v. Secretary of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir.1978)). *See also Adams v. Chater*, 93 F.3d 712, 715 (10th Cir.1996). On the other hand, the court is cognizant of the fact "that the severity of pain is inherently subjective." *Luna*, 834

F.2d at 165. Therefore, the court will consider whether substantial evidence supports the ALJ's reasons for discounting plaintiff's subjective evidence. *See Bean v. Chater*, 77 F.3d 1210, 1213 (10th Cir.1995). Factors to be considered at this point include but are not limited to:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or monmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony and objective medical evidence.

*Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.1995) (internal quotation marks and citation omitted). In making his determination, the ALJ must "explain why the specific evidence relevant to each factor led him to conclude claimant's subjective complaints were not credible." *Id.* at 391.

■ Application of the above factors reveals the following evidence. First, plaintiff testified that he was not currently seeking medical care for his back. (R. 41). To counter this indicator of low credibility, plaintiff claims he could not afford medical care. A claimant's failure to obtain medical care may be excused for financial reasons. *See Walker v. Callahan*, 990 F.Supp. 1283, 1287 (D.Kan.1997). However, as the ALJ notes, plaintiff testified he had not sought out any treatment from low-cost or no-cost medical providers. (R. 42). Second, since plaintiff's original surgery in 1985, plaintiff has received only conservative treatment. *See Campbell v. Bowen*, 822 F.2d 1518, 1522 (10th Cir.1987) (noting conservative treatment undermines allegations of disabling impairment). Plaintiff argues his financial situation prevented him from seeking more extensive treatment. The record reveals, however, that Dr. Jones opined further surgery was not warranted in plaintiff's case, (R. 221) and plaintiff himself told Dr. Jones he was not interested in surgery. (R. 222). Third, plaintiff's daily activities are rather extensive. Plaintiff testified to rising by five in the morning to assist his children in preparing for school and then cleaning up after breakfast. (R. 42). He is responsible for most housekeeping tasks and described himself as a "househusband." (R. 43). These domestic duties include occasional sweeping, doing the laundry, and meal preparation. (R. 42). He requires an assistive device only "sometimes" around the house. (R. 47). Plaintiff does some hobby work with models, and plaintiff is able to drive his car. (R. 47). *See Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir.1994) (addressing daily activities within a credibility determination). Finally, the objective medical record and plaintiff's subjective allegations are simply not compatible. As discussed above, absent the assessments of Drs. Ketcher and Penner, the record does not indicate the severity of limitations described by plaintiff. This inconsistency is highlighted by the physicians' (Drs. Jones, Patricoski, and Khorshad) suggestion that plaintiff could receive vocational rehabilitation and perform sedentary work. Therefore, the court finds the ALJ's determination that plaintiff's credible limitations are less severe then his subjective allegations is supported by substantial evidence.

### 3. Error in the Hypothetical

■ Plaintiff's final claim of error is that the ALJ incorrectly posed his hypothetical question to the vocational expert ("VE"). A proper hypothetical question must set forth all of plaintiff's actual disabilities. *Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir.1985). It is sufficient if the

hypothetical sets forth the impairments that are accepted as true by the ALJ. *Talley v. Sullivan,* 908 F.2d 585, 588 (10th Cir.1990). Plaintiff asserts the hypothetical was erroneous because the ALJ improperly substituted his judgment for that of plaintiff's physicians and the state agency non-examining physicians. This argument is primarily a reassertion of plaintiff's position regarding Drs. Ketcher and Penner. The court has already found the ALJ did not err in disregarding the doctors' assessments. As for the non-examining doctors (R. 252, 260), the ALJ states he deviated from their reports because his RFC included the testimony delivered at plaintiff's hearing. The court finds, after comparing the state's RFCs and the ALJ's RFC, little distinction between the two. However, any deviation on the part of the ALJ was justified, for his RFC embodied not only his findings regarding plaintiff's allegations of pain but also his decision regarding Drs. Ketcher and Penner. The ALJ presented a hypothetical based on the impairments he found to be credible and excluded those he discredited as not supported by the medical record. Plaintiff does not challenge the VE's conclusion regarding available jobs in the national market. Therefore, the court concludes that defendant met his burden at step five to show that a significant number of jobs exist that plaintiff can perform.

## VI. CONCLUSION

After reviewing the record in it totality, the court finds the decision of the ALJ in denying plaintiff disability status is supported by substantial evidence.

**IT IS THEREFORE BY THIS COURT ORDERED** that the decision of the Commissioner is hereby affirmed.